# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**TIANT HUTCHINSON,**

     **Plaintiff,**

**vs.**                                   **Case No. 4:20cv18-MW-MAF**

**DR. NAYYER ISLAM,**
**and DR. A. VARONA,**

     **Defendants.**

_____/

## FIFTH REPORT AND RECOMMENDATION[1]

     Defendant Varona filed a motion for summary judgment, ECF No. 77, on October 15, 2021.  The pro se Plaintiff was given notice of his obligation to file a response to that motion if he opposed it, ECF Nos. 79 and 81, and given an extension of time, ECF No. 83, to do so.  Plaintiff's response was

---

[1] The first Report and Recommendation entered in this case recommended granting Defendant Islam's motion to set aside the Clerk's default.  ECF No. 39.  That recommendation was adopted without objection.  ECF No. 45.  The second Report and Recommendation, ECF No. 61, recommended granting Defendant Varona's motion to dismiss in part.  It was also adopted without objection.  ECF No. 62.  The third Report and Recommendation, ECF No. 63, concerned the motion to dismiss filed by Defendant Cortes.  ECF No. 49.  That recommendation was also adopted, ECF No. 64, and Defendant Cortes was dismissed from this action.  The fourth Report and Recommendation, ECF No. 97, concerned only Defendant Islam's summary judgment motion, ECF No. 78.  That recommendation is still pending.

timely filed, ECF No. 84, as was Defendant Varona's reply.  ECF No. 85.

The motion is ready for a ruling.

**Allegations of the Amended Complaint, ECF No. 14**

Plaintiff is a prisoner in the custody of the Florida Department of

Corrections.  In May of 2013, Plaintiff fractured his right knee while

incarcerated at Wakulla Correctional Institution Annex.  *Id.* at 3.  X-rays

confirmed Plaintiff "suffered a fracture of his medial tibial plateau" and

Plaintiff alleged that he was informed he needed surgery so "his knee

would properly heal."  *Id.*  Plaintiff was transferred to the Regional Medical

Center in August 2013 for surgery, but the surgery was not performed and

he was transferred to Santa Rosa Correctional Institution Annex.  *Id.*

Subsequent x-rays were taken in November 2013, indicating that Plaintiff's

"fractured knee was getting worse."  *Id.* at 4.  Plaintiff was given pain

medication and a "bed rest lay-in pass" from a Nurse Practitioner, but

surgery was neither recommended nor rescheduled.  *Id.*

In 2016, Plaintiff was housed at Liberty Correctional Institution and

then transferred to Walton Correctional Institution.  *Id.* at 4.  Plaintiff alleged

that the "pain in his right knee would not subside."  *Id.*  Plaintiff contends he

went to sick call, had x-rays, and was given pain medication, a knee brace,

and a bed rest lay-in pass, but no steps were taken to "properly" treat his knee or schedule surgery." *Id.*

In 2018, Plaintiff was transferred to Jefferson Correctional Institution. *Id.* at 4. In July, he "declared a medical emergency concerning the pain in his knee but was not seen by the doctor at that time." *Id.* Defendant Varona ordered x-rays and then informed Plaintiff "that his right knee suffered from Degenerative Joint Disease (DJD)" and, according to Plaintiff, she also informed him "that the fracture in his knee required surgery" so it would "heal properly." *Id.* Despite that information, Defendant Varona did not recommend or schedule the surgery and, instead, simply gave Plaintiff "pain medication, a bed rest lay-in, and told him to rest." *Id.* at 5. Plaintiff claims Defendant Varona failed to properly treat his serious medical condition. *Id.*

Five months later Plaintiff was examined by Dr. Gunsby who also said Plaintiff was "suffering from DJD" and needed surgery. *Id.* Shortly after that visit, Plaintiff was transferred to Holmes Correctional Institution, still without surgery. In February of 2019, his "knee gave out" and he was taken to medical where he was examined by Dr. Lopez Rivera. *Id.* Surgery was ultimately performed on May 24, 2019. *Id.*

Plaintiff complains that even after the surgery he "continues to suffer complications from his knee." *Id.* Plaintiff still suffers daily with pain and contends that inaction of all the named Defendants caused him permanent damage. *Id.* Plaintiff raises an Eighth Amendment claim[2] against Defendant Varona for deliberate indifference. *Id.* at 6. As relief, Plaintiff seeks a declaratory judgment, compensatory and punitive damages, and "such other relief as it may appear that the Plaintiff is entitled." *Id.* at 6-7.

**Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477

---

[2] Plaintiff also attempted to assert a state law claim for negligence and medical malpractice against Defendant Varona as well. *Id.* at 6. However, the state law claims have already been dismissed. ECF No. 63 at 15-18; ECF No. 64.

U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). In this case, the parties were provided adequate time to conduct discovery.[3]

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553. The non-moving party must then show[4] though affidavits or other Rule 56 evidence "that there is a genuine issue for trial" or "an absence of evidence to support the

---

[3] The Initial Scheduling Order was entered on June 17, 2021. ECF No. 72. Discovery lasted until September 24, 2021. *Id.*; *see also* ECF No. 75. Plaintiff has complained that he was denied discovery because Defendant Varona was not required to respond to his interrogatories. *See, e.g.,* ECF No. 84 at 1. However, Plaintiff gave his interrogatories to prison officials for mailing on September 22, 2021, and the due date of discovery was September 24th. *See* ECF No. 72 at 2. Plaintiff's interrogatories were untimely by approximately one month, *see* ECF No. 81, not two days as he contends. ECF No. 84 at 1.

[4] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

nonmoving party's case." *Id.* at 325, 106 S. Ct. at 2554; Beard v. Banks,

548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

An issue of fact is "material" if it could affect the outcome of the case.

Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th

Cir. 2004) (citations omitted).  Additionally, "the issue of fact must be

'genuine'" and the non-moving party "must do more than simply show that

there is some metaphysical doubt as to the material facts."  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348,

1356, 89 L. Ed. 2d 538 (1986) (other citations omitted).  "The mere

existence of some factual dispute will not defeat summary judgment unless

that factual dispute is material to an issue affecting the outcome of the

case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th

Cir. 2003) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir.

2000)).  All reasonable inferences must be resolved in the light most

favorable to the nonmoving party, Sconiers v. Lockhart, 946 F.3d 1256,

1262-63 (11th Cir. 2020), and the Court must decide "whether the evidence

presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law."

Hickson Corp., 357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)).

"Summary judgment is not a time for fact-finding; that task is reserved for trial."  Sconiers, 946 F.3d at 1263 (11th Cir. 2020) (citing Tolan v. Cotton, 572 U.S. 650, 655-57, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)). In ruling on a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249, 106 S. Ct. at 2511 (quoted in Sears v. Roberts, 922 F.3d 1199, 1205 (11th Cir. 2019)).

**The Relevant Rule 56(e) Evidence**[5]

On May 13, 2013, Plaintiff requested a right knee brace for a "past injury" to his knee.  ECF No. 77 at 37 (Ex. A at 1).  At one point during

---

[5] Plaintiff filed a response to Defendant Varona's summary judgment motion.  ECF No. 84.  However, Plaintiff merely attached Defendant Varona's summary judgment motion to his response, ECF No. 84 at 5-135, along with four photocopied pages, ECF No. 84 at 136-139.  Plaintiff did not cite to any specific page of that evidence to support a factual assertion.  The parties were previously informed that N.D. Fla. Loc. R. 56.1(F) requires pinpoint citations to enable the Court to readily locate the source of an asserted fact.  ECF No. 79 at 6.  Judges are not archaeologists and "need not excavate masses of papers in search of revealing tidbits—not only because the rules of procedure place the burden on the litigants, but also because their time is scarce."  Nw. Nat. Ins. Co. v. Baltes, 15 F.3d 660, 662-63 (7th Cir. 1994).  That is especially true in this case because Defendants' evidence is not presented in chronological order, but was randomly submitted.  Ex. A of ECF No. 77.

Plaintiff's treatment he said that he injured it "playing football in 2000."

ECF No. 77 at 84 (Ex. A at 455).[6]  At another point Plaintiff said he injured

his knee on May 13th "while running."  *Id.* at 41 (Ex. A at 148, 151).  A third

notation in his medical records stated that Plaintiff injured his knee playing

basketball in 2013.  *Id.* at 111 (Ex. A at 769).

X-rays were taken on May 24, 2013.  *Id.* at 46 (Ex. A at 168).  The

findings were "deformity involving the medial tibial plateau where there is

concave defect among articular surface and cortical disruption along the

articular margin."  *Id.*  The report noted that the findings correlated "with

history of trauma" to that region "and tibial plateau fracture."  *Id.*  "Some

minimal degenerative changes" were noted "along with suprapatellar

effusion."  *Id.*

On June 21, 2013, a consultation request to Reception and Medical

Center ("RMC") Orthopedics was submitted to evaluate Plaintiff's knee.  *Id.*

at 43 (Ex. A at 150).  The request noted the x-ray results from May 2013,

history of trauma to the right knee, and Plaintiff's complaints of pain in the

---

[6] The pages of Exhibit A are not numbered sequentially.  The page number used is the stamped number on the bottom right corner of the page.  In referencing the evidence in this case, the page number on the Court's electronic docket is referenced as well as the page number of the exhibit since the pro se Plaintiff does not have access to the Court's electronic docket.

right knee pain with weight bearing," and minimal swelling.  *Id.*  A notation on that form indicates it was "unknown when" or "how the actual injury occurred."  *Id.*

The consultation request was approved and Plaintiff was examined by Dr. Carlos Esquiva, an orthopedist, at RMC on August 13, 2013.  *Id.* at 44 (Ex. A at 151).  Dr. Esquiva noted that Plaintiff was "ambulatory" and full weight bearing on both feet.  *Id.*  He also noted Plaintiff had a "minimally displaced fracture at medial tibial plateau."  *Id.*  He recommended Plaintiff take 500 mgs. of Naprosyn twice a day for two months, then return for follow-up x-rays in two months.  *Id.* at 44 (Ex. A at 151).

Plaintiff returned to Dr. Esquiva on October 15, 2013.  *Id.* at 42 (Ex. A at 149).  Dr. Esquiva noted Plaintiff was able to ambulate without any assistance and noted that the most recent x-rays showed the fracture was "healing well," between 65% and 70%.  *Id.*  Because Plaintiff complained of numbness in his right foot and said his right knee brace had been taken away, Dr. Esquiva recommended that Plaintiff be given a neurology evaluation.  *Id.* at 114.  Plaintiff was also prescribed 600 mg. of Motrin for 90 days, a low bunk bed pass, and recommended for a follow-up visit in 6 months with additional x-rays.  *Id.*

The consultation request was ultimately denied. *Id.* at 40 (Ex. A at 143). Notwithstanding, at some point another x-ray was ordered and was taken on November 6, 2013. *Id.* at 45 (Ex. A at 164). The x-ray results showed "a comminuted depressed fracture of the medial tibial plateau." *Id.* at 45 (Ex. A at 164). The results stated the fracture did "not appear acute as the fracture fragments [had] rounded edges and there [was] no knee joint effusion." *Id.* The impression was "subacute to chronic fracture of the medial tibial plateau." *Id.*

In December 2013, Plaintiff again injured his knee while doing pull-ups. ECF No. 77 at 122 (Ex. A at 1051). He said he "came down the wrong way" and reported pain in his right knee. *Id.* The medical record notes a "grinding at joint felt with movement." *Id.* There was mild swelling. *Id.* Plaintiff was referred to sick call, *id.*, and instructed to "not participate in activities that involve heights, pull ups, basketball, [and] other sports" which could be injurious to the knee. *Id.* at 123 (Ex. A at 1052).

The medical records reveal that Plaintiff did not report to medical with complaints of knee pain between December 30, 2013, and July 24, 2014. ECF No. 77 at 89 (Ex. A at 508). In late July, however, Plaintiff reported to sick call at Santa Rosa C.I. and complained that his knee brace had been

taken while he was in confinement and not returned.[7]  ECF No. 77 at 89
(Ex. A at 508).  Plaintiff complained of right knee pain, but reported no
recent trauma, no numbness or tingling, and said he could walk and bear
weight on his leg.  *Id.*  A notation on the "pain protocol" form indicated
Plaintiff ambulated with a "straight, even gait" and even"hopped" onto the
examination table.  *Id.*  He was able to bend and straighten his knee, but
reported that it felt stiff.  *Id.*  There is no indication that any action was
taken concerning the missing knee brace.

On August 11, 2014, Plaintiff submitted an inmate request to obtain a
knee brace.  ECF No. 77 at 49 (Ex. A at 291).  He said that his right knee
was "in constant pain" and it was causing his ankle to hurt as well.  *Id.*
Plaintiff said he knew his knee "was fractured" and said he "desperately
needed surgery."  *Id.*  The response told Plaintiff to sign up for sick call for
his knee pain and bring his property sheet with him to sick call.  *Id.*

Plaintiff was examined in sick call on August 15, 2014.  ECF No. 77
at 86 (Ex. A at 484).  Plaintiff complained that his right knee was "still
hurting," but the nurse noted that Plaintiff ambulated from the quad, down

---

[7] Plaintiff was reissued a knee support brace on December 30, 2013.  ECF No. 77 at
87 (Ex. A at 492).

the hall, and into medical without any limp or gait abnormalities. *Id.* Nurse

Simpson also found no swelling, and noted his right leg was "well

muscled." *Id.* When Plaintiff was informed that no treatment was needed,

he "became argumentative and was escorted from Medical." *Id.*

On January 23, 2015, Plaintiff was seen in the medical department at

Liberty Correctional Institution for his complaint of right knee pain. ECF

No. 77 at 84 (Ex. A at 455). He told the nurse he had injured his knee

while playing football in 2000, and said his pain was at a level 8 out of 10.

*Id.* No swelling was noted, no deformity, and Plaintiff was instructed to

elevate his leg as much as possible over the next 48-72 hours. *Id.* at 84-85

(Ex. A at 455-456). It appears no treatment was provided.

A year later, on January 8, 2016, Plaintiff reported pain in his right

knee to medical staff at Liberty C.I. ECF No. 77 at 83 (Ex. A at 448).

Plaintiff indicated the pain started "several days ago" and his movement

was limited. *Id.* His right knee was "tender to palpation to active and

passive [range of movement]," so x-rays of the knee were ordered. *Id.*

Additional x-rays were taken on January 12, 2016. *Id.* at 82 (Ex. A at

447). The results revealed a "mildly depressed medial tibial plateau

fracture which could be subacute or chronic." ECF No. 77 at 100 (Ex. A at

602).  No "periarticular soft tissue swelling [was] noted."  *Id.*  There was "no

join effusion," and alignment was "excellent."  *Id.*  Bone density was

"normal and uniform," and there was no significant arthropathy.  *Id.*

Plaintiff was evaluated by Nurse Lewis on January 14, 2016, and he

said that he needed "some support" for his knee.  *Id.* at 82 (Ex. A at 447).

He complained of pain and the nurse found his knee warm to the touch.  *Id.*

He was given an ace wrap for his pain, and a request for sick call was

submitted.  *Id.*  Plaintiff was informed to elevate his knee when not

ambulating.  *Id.*  He was issued another knee support on January 25, 2016,

by Dr. Cortes, and given a pass for one year.  *Id.* at 90 (Ex. A at 566).

Just after that one year period, Plaintiff submitted a sick call request

on April 6, 2017.  ECF No. 77 at 79 (Ex. A at 406).  He complained of

constant pain in his meniscus and said it was to the point where he could

not bend his knee.  *Id.*  He also requested another knee brace.  *Id.*  The

record indicates Plaintiff was to be triaged in sick call, *id.* at 79, but that did

not occur until April 10, 2017.[8]  *Id.* at 80 (Ex. A at 407).  The nurse noted

there was mild swelling, that it was chronic pain, and Plaintiff could walk

---

[8] The medical record indicated that Plaintiff was "unable to be seen at sick call" on
April 7th due to a security issue.  *Id.* at 81.

and bear weight on the leg, but he said it hurt to do so.  *Id.*  Plaintiff said he could bend the leg, but "not all the way."  *Id.*  The medical record indicates that Plaintiff was not provided any treatment and his condition was deemed not be a "medical emergency."  *Id.* at 81 (Ex. A at 408).   He was told to take acetaminophen or ibuprofen every 4-6 hours for pain, and to return if he experienced new problems.  *Id.*

It appears that Plaintiff submitted another request for sick call on April 14, 2017.  ECF No. 77 at 76 (Ex. A at 402).  He reported again that he was in "severe pain" and could not bend his knee.  *Id.*  He was seen that same day, and advised that he had experienced pain in his knee for three years, but had been experiencing swelling for the past two months.  *Id.* at 77 (Ex. A at 404).  He said the pain was gradual, and indicated he could bend and straighten his knee although it felt stiff, said he could walk and bear weight on it, and he denied numbness or tingling.  *Id.*  Plaintiff was scheduled for an evaluation by the clinician.  *Id.* at 78 (Ex. A at 405).

The evidence reveals that Plaintiff signed a "refusal of health care services" form on April 19, 2017.  ECF No. 77 at 48 (Ex. A at 244).  Plaintiff acknowledged that his refusal to see the doctor was "against the advice of

[his] health care providers" and his refusal was witnessed by two nurses. *Id.*

Over a year later, Plaintiff was transferred to Jefferson Correctional Institution on June 12, 2018.  ECF No. 77 at 71 (Ex. A at 368).  At the time of his transfer, Plaintiff was not currently taking any medications and was not receiving any health care.  *Id.* at 368.  He did not report a current medical complaint and did not advise of a need for any passes.  *Id.* at 72 (Ex. A at 369).

On July 10, 2018, an x-ray of Plaintiff's right knee was taken.  ECF No. 77 at 98 (Ex. A at 599).  It appears to have been requested by ARNP Balogun on that same day because of Plaintiff's complaint of knee pain.[9] ECF No. 77 at 99 (Ex. A at 600).  Although the record indicates it was a "limited exam due to 1 frontal view only," the results were a non-acute fracture at the medial tibial plateau with 1 cm of depression.  ECF No. 77 at 98 (Ex. A at 599).  It also revealed there was moderate degenerative joint disease ("DJD") at the medial compartment.  *Id.*

---

[9] Defendant Varona has not pointed to any evidence to explain how or when Plaintiff's complaint of knee pain was brought to the attention of medical staff.

Defendant Varona was employed as a medical doctor at Jefferson

C.I. between December 2014 and April 2019.  Ex. B at ¶2.  Dr. Varona

reviewed the radiology report on July 16, 2018.  ECF No. 77 at 98 (Ex. A at

599).  After reviewing the report, Defendant Varona "determined the

radiology report erroneously stated there was a 1 cm depression when

there was actually only a 1 mm depression."  *Id.* at ¶5.  Dr. Varona made a

note for staff to schedule a follow-up appointment with Plaintiff to go over

the x-ray results.  Ex. B at ¶6.  Dr. Varona does "not have any control over

the scheduling."  *Id.*

The first time Dr. Varona met with Plaintiff was three months later, on

October 12, 2018.  *Id.* at ¶8.  The primary purpose of the visit was to go

over Plaintiff's "positive PPD result," but it was also to discuss both his

knee x-ray results, and a chest x-ray which was taken on October 11,

2018, after testing positive for tuberculosis.  Ex. A at 597; Ex. B at ¶8.  The

chest x-ray results revealed no "evidence of active acute tuberculosis" and

"no inflammatory process [was] present to suggest tuberculosis."  ECF No.

77 at 97 (Ex. A at 597).

During that meeting with Plaintiff, Dr. Varona observed that Plaintiff

could "ambulate without any assistance" and she noted his daily living

activities were not affected by his knee.  Ex. "B" at ¶ 8.  Dr. Varona

determined that Plaintiff's fracture was "healing by itself and there was no

swelling or joint effusion."  *Id.*  Dr. Varona nevertheless prescribed a knee

support and low bunk pass for Plaintiff so he would not re-injure or

otherwise aggravate the knee.  *Id.* at ¶9.

Dr. Varona stated that at the time she evaluated Plaintiff, he "was not

experiencing the medically requisite indicia for [her] to recommend surgery"

or refer him for an orthopedic evaluation.  *Id.* at ¶14.  The "articular

cartilage in the patella was not affected by his fracture or DJD."  *Id.*  Plaintiff

"still had sufficient lubrication allowing his right knee to bear a load and

slide with no evidence of friction or wear and tear."  *Id.*  Dr. Varona states

that "nonsurgical treatment and medical management" is an accepted

treatment for knee conditions such as Plaintiff's condition in October of

2018.  *Id.* at ¶ 15.  Surgical options "are generally short-lived" resolutions

for symptoms.  *Id.*

Although Plaintiff was only 36 years of age, "DJD is part of the normal

aging process."  *Id.* at ¶13-¶14.  "Patients who suffer tibial plateau fractures

are at risk of joint degeneration and post-traumatic arthritis, even when

treated according to traditional orthopaedic principles."  *Id.* at ¶13.

Dr. Varona stated that "patients with post-traumatic arthritis have worse clinical outcomes after arthroplasty."  *Id.*

Beyond issues with his knee, Dr. Varona advised that Plaintiff had "a positive PPD test," and she referred him to the tuberculosis clinic.  *Id.* at ¶9; *see also* ECF No. 77 at 70 (Ex. A at 357).  Dr. Varona saw Plaintiff for second time on October 22, 2018, for his "initial" tuberculosis clinic visit. *Id.;* see also Ex. B at ¶10.  She took his vitals which were "within normal limits," and physically observed and examined him.  Ex. B at ¶10.  Plaintiff did not complain to her about knee pain at that time, and he did not submit a sick call request to her at a later point concerning knee pain.  *Id.* Dr. Varona did not see, treat, or otherwise evaluate Plaintiff beyond that second visit on October 22, 2018.  *Id.* at ¶11.

The following month, on November 29, 2018, Plaintiff was transferred away from Jefferson C.I., and appears to have been assigned to Holmes Correctional Institution in early December 2018.  ECF No. 77 at 132 (Ex. C at 2).  On January 26, 2019, Plaintiff submitted an inmate request to medical seeking an urgent appointment because of "extreme pain and discomfort" in his right knee.  ECF No. 77 at 68 (Ex. A at 346).  Plaintiff said he had "been dealing with a fracture in [his] right knee for awhile," and

stated that he really needed to see a doctor.  *Id.*  He was evaluated by a

nurse on January 29, 2019, and given a knee brace and pass, and

scheduled to see the clinician.  *Id.* at 67 (Ex. A at 343).

Plaintiff was examined by Dr. Lopez-Rivera on January 29, 2019.

ECF No. 77 at 66 (Ex. A at 342).  Plaintiff reported having constant pain,

which he said was "stabbing," and he rated his pain a 10 out of a 10.  *Id.*  ,

Plaintiff said the only thing that had helped was the knee brace, but he

complained that he could not play sports or run anymore.  *Id.*  Dr. Lopez-

Rivera assessed Plaintiff, reviewed the July 2018 x-rays, and requested an

orthopedic surgery consultation.  *Id.*  The doctor also prescribed Mobic for

Plaintiff, ordered a new right knee x-ray, and recommended a follow-up

appointment after Plaintiff was evaluated by the orthopedic surgeon.  *Id.*

Dr. Lopez-Rivera submitted a routine consultation request on January 31,

2019, listing a provisional diagnosis of right knee medial tibial plateau

fracture.  ECF No. 77 at 92 (Ex. A at 574).

An x-ray was taken of Plaintiff's right knee on February 6, 2019.  ECF

No. 77 at 94 (Ex. A at 591).  That x-ray was compared to the July 2018 x-

ray and showed a "medial tibial plateau fracture with 6 mm lateral

displacement and 3 mm articular step off."  *Id.*  The overall knee joint

alignment was "within normal limits," no acute fracture was identified, but the conclusion was: "[i]ntra-articular medial tibial plateau fracture. No significant interval healing." *Id.*

Before Plaintiff was seen by the orthopedic surgeon or had his follow-up appointment, Plaintiff was seen in medical on February 24, 2019. ECF No. 77 at 64-65 (Ex. A at 339-340). Plaintiff said he and another inmate were playing around and the inmate pushed him, causing his knee to "go out." *Id.* Mild swelling was noted and Plaintiff could only slightly move his knee. Plaintiff was told to elevate his leg, apply ice, continue taking Mobic and using his knee brace, and he was issued a crutch pass for seven days. *Id.*

Plaintiff was examined by the clinician on February 25, 2019. ECF No. 77 at 63 (Ex. A at 338). Plaintiff again said that his friend had pushed him the day before and he fell. *Id.* He described his pain as "aching" and "sharp" and rated it 7 out of 10. *Id.* The medical assessment was "acute exacerbation of chronic pain." *Id.* Another x-ray was ordered to determine if Plaintiff had a new fracture. *Id.*

The x-ray was taken that same day and compared with the February 6, 2019, x-rays. *Id.* at 96 (Ex. A at 595). The February 25th results

showed "no acute fracture or dislocation." *Id.* "The osseous structures appear stable" and the joint spaces were "preserved." *Id.* "Soft tissues [were] unremarkable." *Id.* The conclusion was "no acute osseous abnormality" and "grossly stable medial tibial plateau fracture." *Id.*

Plaintiff was evaluated by Dr. T. Winters on March 15, 2019, and a consultant's report was completed. ECF No. 77 at 93 (Ex. A at 575). He found Plaintiff had "poor motion" and the "start of changes laterally," but he did not feel that Plaintiff was a candidate for a unicompartmental replacement surgery. *Id.* Dr. Winters noted that Plaintiff wanted to proceed with a total knee arthroplasty. *Id.*

Dr. Winters ordered another x-ray of Plaintiff's right knee that same day. *Id.* at 593. The results were compared again to the February 25, 2019, results and showed "no new fracture, dislocation, or destructive bony process." *Id.* There was "no soft tissue abnormality" and no callus formation. *Id.* The conclusion was an unchanged, subacute non-healing "medial tibial plateau fracture." *Id.*

Plaintiff was scheduled to have a total knee arthroplasty surgery in mid-April 2019. ECF No. 77 at 62 (Ex. A at 319). Because Plaintiff admitted to smoking an unknown substance within the past 72 hours, his

surgery was cancelled and rescheduled.  *Id.*  However, on the date of the

rescheduled procedure (April 25, 2019), Plaintiff "had drugs in his system"

so the surgery was cancelled for a second time and rescheduled.  *Id.*

Ultimately, Plaintiff underwent a total right knee arthroplasty by

Dr. Tom Winters on May 24, 2019.  ECF No. 77 at 58 (Ex. A at 308).  The

operative report noted Plaintiff had "severe degenerative arthritis."  *Id.*

On June 7, 2019, Plaintiff was examined by Dr. J. Ryan.  ECF No. 77

at 91 (Ex. A at 570).  His report states that Plaintiff's incision had "healed"

and his stitches were removed.  ECF No. 77 at 91 (Ex. A at 570).  No

redness was noted and the knee had good alignment.  *Id.*  Plaintiff was

directed to participate in physical therapy to work on his knee's range of

motion, and to return for a follow-up in four to six weeks.  *Id.* ; *see also* ECF

No. 77 at 60 (Ex. A at 310).  It appears that Plaintiff had physical therapy

later that same day.  ECF No. 77 at 55 (Ex. A at 305).

Notwithstanding the examination by Dr. Ryan, Plaintiff's recovery did

not go well.  The day before Plaintiff saw Dr. Ryan, Plaintiff reported having

a fever and said he did not feel well.  ECF No. 77 at 57 (Ex. A at 307).   On

June 6, 2019, a registered nurse noted Plaintiff's right knee had swelling,

was warm to the touch, and found Plaintiff was "at risk for infection."  *Id.*  A

notation indicates Plaintiff need a doctor to evaluate his condition. *Id.* It appears that Plaintiff was evaluated later that day by Dr. A. Acevedo. ECF No. 77 at 56 (Ex. A at 306). Plaintiff was found to have extremity edema with increased temperate of the right leg and knee, and Dr. Acevedo noted in the record that Plaintiff had a "wound infection." *Id.* It appears treatment was provided to Plaintiff and he was given medication. *Id.* The record further reveals that Dr. Acevedo followed up with Plaintiff later that day, but the specifics of those visits are unknown because Dr. Acevedo's hand-writing is not legible. *Id.*

On June 14, 2019, Plaintiff was seen in urgent care, concerned that his knee was still infected. ECF No. 77 at 54 (Ex. A at 304). Plaintiff's right knee was warm to the touch, swollen, and a discharge from the incision was noted. *Id.* The nurse referred Plaintiff to be seen by Dr. Acevedo, *id.*, and Plaintiff was assessed the next day. ECF No. 77 at 53 (Ex. A at 303). It again appears that Plaintiff was provided treatment, but the notes are not legible. *Id.*

Throughout June 2019, Plaintiff made complaints to his physical therapists that he was experiencing increased pain and soreness, and had difficulty bending his knee. ECF No. 77 at 51-52 (Ex. A at 301-302). On

June 20, 2019, he reported that he did not "feel good" and was nauseous. *Id.* at 51 (Ex. A at 301). The record indicates the nurse assessed him as being at "risk for electrolyte imbalance" and he was educated on the important of hydration and nutrition. *Id.* During his next three physical therapy appointments, he continued to complain that the swelling was "not going down and the pain [was] still bad." *Id.* at 50 (Ex. A at 299). He said his pain was at an 8 on a 1-10 scale. *Id.* By June 26, 2019, Plaintiff complained that his right knee was "getting worse" and he could not straighten out his knee. *Id.*

On July 5, 2019, Plaintiff told his physical therapist that he was "getting better" but still had difficulty walking. ECF No. 77 at 109 (Ex. A at 713). The therapist noted that Plaintiff had "not met all goals yet" and recommended ongoing therapy twice a week for four more weeks. *Id.*

On September 6, 2019, Plaintiff was hospitalized at RMC with a diagnosis of "severe arthritis of the right knee." ECF No. 77 at 116 (Ex. A at 833. The record notes Plaintiff's status as "post right total knee arthroplasty" and said he was admitted "after right knee exploration and joint aspiration due to swelling." *Id.* He remained hospitalized until

September 18, 2019. *Id.* At that point, his knee swelling had

"ameliorated." *Id.* Plaintiff was instructed to follow up with his primary care

physician, orthopedic provider, and with physical therapy. *Id.*

The record indicates Plaintiff continued with physical therapy in

September and October 2019, but also continued to complain of pain and

said he still could not straighten his knee. ECF No. 77 at 107-108 (Ex. A at

701-702). He complained about fluid in his knee and said it was "puffy."

*Id.* at 108 (Ex. A at 702).

Plaintiff had a follow-up visit with Dr. Winters in November 2019. ECF

No. 77 at 110 (Ex. A at 767). The doctor advised that Plaintiff needed to be

out of the wheel chair and ambulating in order to get his strength back. *Id.*

Dr. Winters encouraged Plaintiff to be more active. *Id.* at 113 (Ex. A at

772). In December, however, there is a notation that Plaintiff arrived for a

consultant's appointment in a wheelchair. *Id.* at 112 (Ex. A at 771).

On January 29, 2020, a consultation request for orthopedics was

prepared by Dr. R. Laubaugh noting "pain post op" and stating his pain was

"no better since surgery." ECF No. 77 at 111 (Ex. A at 769). Dr. Laubaugh

noted Plaintiff had twisted his right knee on January 13, 2020, and said the

pain was worse. *Id.*

The record indicates Plaintiff underwent a manipulation procedure in September 2019, and a second manipulation in June 2020. ECF No. 77 at 114 (Ex. A at 783). Dr. Winters discussed another manipulation and an arthroscopy procedure, which Plaintiff said he wanted. *Id.* Plaintiff underwent a "manipulation with arthroscopy and shaving of right knee" on February 12, 2021, by Dr. Winters. *Id.* at 115 (Ex. A at 832). The notes indicate there was "scar tissue but no signs of any infections." *Id.*

In late March 2021, Plaintiff began complaining that his right hip was bothering him, but said the pain in his knee was not bad, "it's just messed up." ECF No. 77 at 105 (Ex. A at 625). He complained that his "knee still doesn't want to bend." *Id.* at 104 (Ex. A at 624). He also said that his left knee was "starting to ache" as well. *Id.* at 102-103 (Ex. A at 622-623). There is no further evidence[10] as to treatment provided for Plaintiff's ongoing issues.

---

[10] Defendant stated within the summary judgment motion that Plaintiff was scheduled for another arthroscopy procedure with Dr. Winters on September 3, 2021, but "the procedure was cancelled" because of an issue with the air conditioning, and the procedure was to be rescheduled as soon as possible." ECF No. 77 at 17 (citing to Ex. A at CENT_001087). However, Defendant's evidence did not include that citation and went no further than "CENT_001052." ECF No. 77 at 123 (Ex. A).

**Analysis**

Deliberate indifference to the serious medical needs of sentenced prisoners violates the Eighth Amendment's prohibition of cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  A "'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Hill v. Dekalb Regional Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D. N.H. 1977)).  Alternatively, "a serious medical need is determined by whether a delay in treating the need worsens the condition" or "if left unattended, poses a substantial risk of serious harm."  Mann v. Taser Intern., Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (citing Hill, 40 F.3d at 1188-89, and Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)).

The concept of deliberate indifference entails something more than negligence, but is satisfied by something less than actions undertaken with an intent to cause harm.  Farmer v. Brennan, 114 S. Ct. 1970, 1978 (1994).

Combining the standards from <u>Farmer</u> and <u>Estelle</u>, the Eleventh Circuit has established four requirements to demonstrate an Eighth Amendment claim for the denial of medical care: "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." <u>Taylor v. Adams</u>, 221 F.3d 1254 (11th Cir. 2000), *cert. denied*, 531 U.S. 1077 (2001); <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003).  Put another way, once a prisoner shows that he has a serious medical need, "the prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence."  <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004) (citing <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999)).

In this case, Defendant Varona challenges that "Plaintiff has not established a serious medical need as it relates to his right knee condition." ECF No. 77 at 19.  In particular, Defendant Varona states that the need was not "serious" when Plaintiff was seen and examined by Defendant Varona.  *Id.* at 20.

Although the evidence reveals Plaintiff has a long history of knee pain, Plaintiff did not have personal contact with Defendant Varona until

October 12, 2018.  *See* Ex. B.  She was able to observe Plaintiff and noted that he could walk without assistance and his daily activities "were not affected by his knee."  Ex. "B" at ¶ 8.  Her review of the x-rays indicated that Plaintiff's fracture was healing, and Plaintiff did not make any complaints to Defendant Varona about pain in his knee.  Ex. B.  In light thereof, Plaintiff's knee was not a serious medical need in October 2018.  Although the evidence reveals his knee became a "serious medical need" later on, after another injury in February 2019, the fact is that Plaintiff was transferred in November 2018 and had no further interaction with Defendant Varona.

Moreover, there is no evidence of any serious issue with Plaintiff's knee in the sixteen month period prior to Plaintiff's meeting with Defendant Varona.  Notably, Plaintiff complained of knee pain on April 14, 2017, but when he had the opportunity to be examined by a physician a few days later, Plaintiff signed a "refusal of health care services" form on April 19, 2017.  ECF No. 77 at 48 (Ex. A at 244).  Plaintiff did not make further complaints of knee pain or seek treatment.  When Plaintiff was transferred to Jefferson C.I. in June 2018, he was not taking any medications, receiving health care, and did not report a current medical complaint.  In

July 2018, another x-ray was taken of Plaintiff's knee because he complained of knee pain, but he was not scheduled to see Defendant Varona until October of that year.  Plaintiff has provided no evidence to show that during the ensuing period he made Defendant Varona aware of any problem with his knee.  He provided no evidence to show that he submitted sick call requests or asked to see the doctor.

Moreover, there is no evidence that Defendant Varona was deliberately indifferent to Plaintiff's medical needs, whether serious or not.  She provided him with a knee brace and low bunk pass, but saw no need for additional treatment.  Plaintiff has not provided any evidence to show that he complained to Defendant Varona of pain or requested medication for pain that was not provided.  There is no indication that during the time Plaintiff was housed at Jefferson C.I., he made any request for medical care that was ignored or otherwise not addressed.  Accordingly, because Defendant Varona was not deliberately indifferent to Plaintiff's medical needs, summary judgment should be granted in her favor.

## RECOMMENDATION

It is respectfully **RECOMMENDED** that Defendant Varona's motion

for summary judgment, ECF No. 77, be **GRANTED**.

**IN CHAMBERS** at Tallahassee, Florida, on May 31, 2022.


 S/    Martin A. Fitzpatrick
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**



## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  See 11th Cir. Rule 3-1; 28 U.S.C. § 636.**